IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **ROBERT MACLEROY,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-395-CLM |
| | ) |
| **CITY OF CHILDERSBURG,** | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Robert Macleroy sues the City of Childersburg, Alabama, his former employer, alleging claims for unpaid overtime under the Fair Labor Standards Act and disability discrimination under the Americans with Disabilities Act. Childersburg has moved for summary judgment on both claims. (Doc. 26).

For the reasons explained within, the Court **GRANTS** Childersburg's motion and summarily dismisses Macleroy's remaining claims.

### FACTUAL BACKGROUND

Macleroy worked as an animal control officer for the City of Childersburg from 1999 to 2017. As animal control officer, Macleroy worked in Childersburg's police department, but he was not classified as a law enforcement officer or a first responder.

### A. Facts about Macleroy's unpaid overtime claim

As a Childersburg employee, Macleroy was required to work a five-day, 40-hour workweek. Each work day consisted of nine hours minus a one-hour, unpaid lunch break. Childersburg allowed Macleroy to take his one-hour lunch break at any point during a two-hour window—from 11:00 AM to 1:00 PM.

Childersburg used time cards to ensure that its employees worked these hours. Macleroy would "clock in and out" with a time card at the start and end of each day, and Childersburg would automatically deduct his one-hour unpaid lunch break from his time. Childersburg employees periodically reviewed and revised their time cards, correcting any errors. After doing so, employees submitted their reviewed and corrected time cards to their supervisors and to Childersburg's payroll clerk, who would each independently double-check the employees' time cards for accuracy.

Macleroy's claim for unpaid overtime stems from his claim that, from 2015 to 2017 (the relevant period here), he sometimes received dispatch calls for animal control jobs during his one-hour lunch break. Childersburg did not document animal control dispatch calls, and Macleroy did not revise his time cards to document them. Instead, Macleroy asserts that his supervisors should have known about the lunchtime calls because animal control dispatch calls came over the police dispatch radio. Macleroy admits that Childersburg authorized him to resume his lunch break after handling a dispatch call but claims there often was no time to do so.

### B. Facts about Macleroy's Disability Claim

Macleroy's disability discrimination claim is based upon his alleged illiteracy. Macleroy dropped out of school in the ninth grade, where he was enrolled in special education classes, and he claims that he never learned to read or write. While Macleroy claims that a doctor may have given a medical reason for his illiteracy to his parents when he was a child, he has not tried to obtain any such diagnosis as an adult. Rather, he says that he is "stubborn" and "didn't want to learn" to read when he was in school. Since dropping out of school, the thought of returning has "never crossed [Macleroy's] mind" because he "ain't interested" in learning.

Macleroy claims that former Childersburg employees Shane Burnett and Misty Hepp knew that he was illiterate because he once asked Burnett to read him a deposition and he thought Hepp knew that he had only an eighth-grade education. Macleroy also claims that Captain Tommy Wallace knew he was illiterate.

Macleroy did not, however, affirmatively disclose his illiteracy to Childersburg employees. On the contrary, he had his wife complete some papers, including his employment application, without telling his colleagues or supervisors. He asked other Childersburg employees to complete other paperwork for him, telling them he could not because "he didn't have his glasses on." And Macleroy signed forms indicating that he had read various Childersburg policies and manuals, without admitting to his colleagues or supervisors that he had not read them.

In his Complaint, Macleroy alleges that Childersburg began "insisting" that he write citations in 2015 and 2016, and he claims that he was terminated because Childersburg "wanted somebody in [his position] that could really write a ticket." (Doc. 1, pp. 5-6; Doc. 24-1, pp. 92-93). But Macleroy was never instructed to write a ticket, nor was he disciplined for failing to write tickets.

Richard McClelland was the Chief of Police when Macleroy stopped working for Childersburg. Macleroy admits that Chief McClelland did not know he was illiterate. Chief McClelland confirms that Macleroy was never responsible for writing tickets. Nor have any of Childersburg's subsequent animal control officers written tickets.

### C. Facts surrounding the end of Macleroy's employment

Three incidents preceded Macleroy's departure in April 2017. First, Macleroy cut wires in his city vehicle without permission, damaging the vehicle. Second, Macleroy called Captain Wallace a derogatory name during an argument. Third, Macleroy refused to show up for work the day after the argument, and he failed to notify either Captain Wallace or Chief McClelland of his absence—a violation of Childersburg policy.

Because of these incidents, Captain Wallace prepared two "employee counsel forms" and one "employee reprimand form," and, on April 18, 2017, Chief McClelland called Macleroy along with Captain Wallace to his office to present

Macleroy with the forms. Upon receiving the forms, Macleroy told Chief McClelland and Captain Wallace that he planned to take two weeks of vacation and that if things did not change after he came back he would quit.

The parties dispute what happened after that. Macleroy claims that Chief McClelland looked at Captain Wallace and asked, "Did he resign?" In response, Macleroy claims that Captain Wallace stated, "Yeah, that's what it sounds like." Macleroy claims that Chief McClelland then looked at him and said, "Put your badge on my desk." Macleroy claims he was terminated, while Childersburg claims Macleroy voluntarily resigned. The parties agree, however, that Macleroy's alleged illiteracy was not discussed at the meeting.

On March 14, 2018, Macleroy filed this lawsuit.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court should grant summary judgment only upon a showing that there is no genuine issue as to any material fact. The moving party bears the burden of proof, and the Court should "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the responsibility for showing the basis for the summary judgment motion. *Id*. A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. *Anderson*, 477 U.S. at 247–48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Anderson*, 477 U.S. at 248).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## ANALYSIS

Macleroy pleaded three claims in his complaint, but the parties previously stipulated to the dismissal of Count II. (Doc. 21). That leaves Macleroy's claims for unpaid overtime wages under the Fair Labor Standards Act ("FLSA") (Count I) and his claim of disability discrimination under the Americans with Disabilities Act ("ADA") (Count III). The Court addresses the claims in that order.

### I. Macleroy's FLSA Claim for Unpaid Overtime Fails as a Matter of Law.

The FLSA requires employers to pay overtime (that is, compensation at a rate at least 1.5 times an employee's regular rate) for all time its employees work above 40 hours per week. 29 U.S.C. §§ 207(a)(1), (a)(2)(C); 203(g). Whether an employer asked its employee to perform overtime work is irrelevant. 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time"). Rather, if an

employer "knows or has reason to believe" that its employee worked overtime, "the additional hours must be counted" for the purpose of overtime pay. *Reich v. Dep't of Conservation and Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994).

Macleroy alleges that Childersburg violated the FLSA by failing to pay him for work he claims to have performed during his daily, one-hour lunch break. Macleroy argues the lunchtime work qualifies as overtime because he performed it on top of his regular 8-hour shift, meaning he worked more than 40 hours per week.

To recover, Macleroy must prove that: (1) he performed overtime work without pay, and (2) Childersburg knew, or should have known, of his overtime work. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Reich*, 28 F.3d at 1082. As a result, to survive summary judgment, Macleroy must provide sufficient evidence to create a jury question that (a) he worked during his lunch hour and (b) Childersburg knew or should have known that Macleroy worked during his lunch hour, yet failed to compensate him. He has not.

**A. Macleroy Fails to Provide Sufficient Evidence that He Worked Without Proper Compensation.**

Although Macleroy bears the burden of proving that he worked overtime without compensation, "[t]he remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee." *Anderson*, 328 U.S. at 687. Thus, under the FLSA, it is

the employer's duty to keep records of its employees' wages, hours, and other conditions and practices of employment. *Id*. If the employer's records are inaccurate or inadequate, the burden shifts to the employer to show the employee did not perform overtime work, so long as the employee offers sufficient evidence to show "the amount and extent of that work as a matter of just and reasonable inference." *Id*. at 687–88; *see also Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1315–17 (11th Cir. 2007). Thus, the Court must first determine whether there is a genuine issue of material fact that Childersburg's records inaccurately reflect the hours Macleroy worked. *Allen*, 495 F.3d at 1316. If a genuine issue of material fact exists, the Court must then determine if there is sufficient evidence from which a reasonable jury could determine the amount and extent of the uncompensated work as a matter of just and reasonable inference. *Id*.

1. Childersburg Accurately Recorded Macleroy's Time.

Macleroy claims that he sometimes received dispatch calls that required him to work between 11:00 AM to 1:00 PM—the two-hour window in which he could take his daily lunch hour.[1] Macleroy argues that Childersburg's records are

---

[1] Presumably, Childersburg offered Macleroy a two-hour window in which to take his one-hour lunch to afford Macleroy flexibility, impliedly recognizing that Macleroy may receive dispatch calls midday. In fact, Macleroy testified that if he ever received a dispatch call in the middle of a lunch break, he was allowed to resume his lunch break after the call was completed. (Doc. 24-1, pp. 62-64).

inaccurate because Childersburg did not keep a record of such calls and thus did not keep a record of the times he worked during his unpaid lunch hour.

But the record shows that Childersburg used a simple method to record Macleroy's work time that obviated any need for it to keep a record of his individual dispatch calls. Childersburg required Macleroy to "clock-in" with a time card at the start of his shift and "clock-out" nine hours later, when his shift ended. Macleroy's one-hour, unpaid lunch break was automatically deducted, yielding eight hours of payable time each day. Macleroy had a two-hour window to take his lunch break, and he could review and revise his time card to correct any errors—for example, that he worked during his one-hour lunch. After Macleroy reviewed and revised his time card for accuracy, his supervisor and Childersburg's payroll clerk would compile and double-check his hours.

Macleroy reviewed his time cards throughout his employment, yet he never sought to correct his time card to show that he worked through his lunch hour. Nor did he make any complaints about any unpaid work.

If, as here, an employer adopts a reasonable process for an employee to report overtime, "the employer is not liable for nonpayment if the employee fails to follow the established process." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012). This "prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the

FLSA." *Id.*; *see also Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414–15 (9th Cir. 1981). Macleroy was in the best position to prove he worked during his lunch break; "[t]o require . . . [an employer] to prove a negative—that an employee was not performing 'work' during a time reserved for meals—would perversely incentivize employers to keep closer tabs on employees . . . ." *Hertz v. Woodbury Cty., Iowa*, 566 F.3d 775, 784 (8th Cir. 2009). So, if any inaccuracies exist in Childersburg's records, they result from Macleroy's failure to correctly report his time under Childersburg's clear, easy to follow process.

    2. <u>Macleroy fails to provide evidence that would allow a jury to determine/ infer the amount of unpaid overtime work</u>.

Even if Macleroy could create a jury question about the accuracy of Childersburg's records (he cannot), he has failed to provide sufficient evidence to allow a jury to reasonably infer the amount and extent of his unpaid overtime work. Macleroy never corrected his time card to show he worked through lunch, nor did he maintain any other record of his missed lunch breaks. More importantly, Macleroy has neither alleged nor produced any persuasive facts to support his claim that he worked through his lunch breaks. Instead, Macleroy depends on a naked assertion that he performed work during his lunch breaks, arguing "[h]is testimony about the hours he worked defeats [Childersburg]'s motion." (Doc. 28, p. 16).

Macleroy's testimony, however, is insufficient to allow any reasonable inference about the amount and extent of overtime work he performed. Macleroy testified in his deposition that he had "no recollection" of how many times he worked during a lunch break. (Doc. 24-1, pp. 128-29). When asked how often he worked through his lunch break, Macleroy guessed:

```
17     Q.   Do you have an opinion as to how
18  frequent that was?
19     A.   Maybe one, two times a week.
20  Maybe more.  Maybe less.
```

(Doc. 24-1, pp. 225-226).

The totality of the evidence, viewed with every inference in Macleroy's favor, fails to create a jury question whether he performed unpaid overtime work.

**B. Macleroy Fails to Provide Sufficient Evidence that Childersburg Knew or Should Have Known of the Unpaid Work.**

Even if Macleroy could prove that he performed work during his lunch breaks, he has failed to show Childersburg had actual or constructive knowledge of such work. Again, automatic meal break deduction systems, like the one Childersburg used, are lawful under the FLSA. So the relevant question here is not merely whether Childersburg knew or should have known that Macleroy was working, but that he was working *and* not reporting his work time accurately. The Court concludes that Macleroy has not shown that there is a triable issue of fact on Childersburg's actual or constructive knowledge of his overtime work.

1. <u>Childersburg Lacked Actual Knowledge</u>.

As discussed in Subsection A, when an "employee fails to notify the employer . . . of [his] overtime work, the employer's failure to pay for the overtime hours is not [an FLSA] violation." See *Debose v. Broward Health*, No. 08-61411, 2009 WL 4884535, at *11 (S.D. Fla. Dec. 17, 2009) (citing *Newton v. City of Henderson*, 47 F.3d 746 (5th Cir. 1995). Macleroy testified in his deposition that he could not recall one specific instance when he complained to anyone with Childersburg that he had not been compensated for overtime work he performed. (Doc. 24-1, pp. 135-36). Macleroy further explained:

```
1   Q.  And, again, I'm not sure if you
2   answered me, but once you started working over
3   your lunch hour on occasion, did you ever
4   attempt to correct either your time card, or
5   once you got your pay or looking at a pay stub
6   or anything, did you ever attempt to correct
7   that with payroll or with a supervisor?
8   A.  No, because once I clocked in, I
9   clocked in at seven, six, five, worked until
10  whenever, I only clocked in twice a day and
11  they deducted my lunch hour.  They're the one
12  that deducted that.
13  Q.  I understand that, but if on a
14  day -- it's deducted every day, they take an
15  hour out, but if you had a day on a Tuesday
16  where you never got to take that hour off, you
17  were working, you never went to payroll and
18  said, hey, Tuesday I never took a lunch, I
19  need to get that hour?
20  A.  No, you just -- you just didn't --
21  you didn't do that, because you would be
22  stirring up another hornets nest.
```

(Doc. 24-1, p. 132).

While Macleroy claims that he told several Childersburg police officers that he worked overtime during his lunch breaks, he does not dispute that he never informed his supervisors or any department heads. (Doc. 24-1, pp. 125-32; Doc. 24-

13; Doc. 24-14; Doc. 24-9, p. 14). Macleroy has thus provided no evidence that Childersburg had actual knowledge of his alleged overtime work.

 2. <u>Childersburg Lacked Constructive Knowledge</u>.

An employer has constructive knowledge of its employee's overtime work "when it has reason to believe that its employee [worked] beyond his shift." *Murray v. Birmingham Bd. of Educ.*, 172 F. Supp. 3d 1225, 1238 (N.D. Ala. 2016). Thus, the issue is not whether Childersburg "could have known [Macleroy] was working overtime hours," but "whether [it] should have known." *Newton*, 47 F.3d at 748.

Macleroy argues that the fact that his supervisors could hear dispatch calls come in during his two-hour lunch break window "serves [Childersburg] with constructive knowledge that he was working through his lunch breaks." (Doc. 28, p. 18). The Court is unpersuaded. Macleroy admits that Childersburg allowed him to take his lunch at a time of his choice within a flexible window and authorized him to resume and finish his lunch if it was interrupted. So there is no reason for anyone who heard a dispatch call come through during that window to think (a) the call interrupted Macleroy's lunch, or (b) that Macleroy would not simply finish his lunch after he handled the call, if the call in fact interrupted his lunch. That was, after all, the point of the two-hour lunch window.

∗ ∗ ∗

In summary, Macleroy had to note any unreported work on his time card, yet he never did. Nor did Mcleroy complain to his supervisors, department heads, or payroll that he had performed unpaid work during his lunch break. As a result, Mcleroy cannot prove either (a) that he worked unpaid overtime hours or (b) that Childersburg either knew or should have known that Mcleroy was working unpaid overtime. Childersburg is thus entitled to summary judgment on Count I.

II.     **Macleroy's Disability Discrimination Claim Fails As A Matter Of Law.**

The Americans With Disabilities Act ("ADA") prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual" in any of the "terms, conditions [or] privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of ADA discrimination, Macleroy must prove that (1) he has a disability; (2) he is a qualified individual; and (3) Childersburg discriminated against him because of his disability. *Morisky v. Broward Cty.*, 80 F.3d 445, 447 (11th Cir. 1996).

Childersburg contends that Macleroy cannot show that he has a disability or that he was terminated "because of" his disability—particularly when Macleroy has not shown that Childersburg knew that he had a disability. The Court agrees.

## A. Macleroy Fails to Provide Sufficient Evidence that He is Disabled.

A person has a disability if he "has a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(1)(A) (2000) (amended 2008); 29 C.F.R. § 1630.2(g) (2011). The ADA defines a "mental impairment" as "any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

Macleroy claims that he is functionally illiterate. However, "while illiteracy is a serious problem, it does not always follow that someone who is illiterate is necessarily suffering from a physical or mental impairment." *Morisky*, 80 F.3d at 448. Macleroy's alleged illiteracy is not a disability (i.e., a mental impairment) in itself. Rather, it may result from a disability. *See Lancaster v. City of Mobile, Alabama*, No. 94-1016-BH-C, 1996 WL 741371, at *3 (S.D. Ala. Aug. 14, 1996), aff'd sub nom. *Lancaster v. City of Mobile, Ala.*, 110 F.3d 798 (11th Cir. 1997).

But Macleroy does not claim to suffer from a diagnosable condition such as a learning disorder. On the contrary, Macleroy admits that his alleged inability to read or write is due simply to his lack of education. (Doc. 24-1, pp. 13, 15). Under the ADA, however, "impairments do not include 'environmental, cultural or economic disadvantages such as poverty, lack of education, or a prison record.'" *Shehab v.*

*Chas. H. Sells, Inc.*, 2004 U.S. Dist. LEXIS 21808 (S.D. New York 2004) (quoting *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997)) (citing 29 C.F.R. Part 1630, App. § 1630.2(h)), *aff'd*, 527 U.S. 471 (1999).

Macleroy presents no evidence to support a claim of mental impairment or disability as required by the ADA. As a result, Macleroy's disability discrimination claim is due to be dismissed.

### B. Macleroy Fails to Provide Sufficient Evidence that Childersburg Knew of his Alleged Disability.

Even if Macleroy provided sufficient evidence that he is disabled, he failed to provide sufficient evidence that Childersburg knew of his disability, and by extension, that Childersburg terminated him "because of" that disability.

To establish a prima facie case under the ADA, Macleroy "must establish that the decisionmaker actually knew of his . . . disability." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185-86 (11th Cir. 2005) ("an employee cannot be fired 'because of' a disability unless the decisionmaker has actual knowledge of the disability"). Yet Macleroy does not dispute that that Chief McClelland—the decisionmaker over Macleroy's employment—knew nothing about Macleroy's alleged illiteracy or any disability causing said illiteracy. (Doc. 24-8, p. 38, 47; Doc.24-1, p. 87). Instead, Macleroy relies on his naked assertion that a handful of Childersburg employees (Shane Burnett, Misty Hepp, and Captain Wallace) knew he was illiterate to support

his claim that Childersburg knew he was disabled. Macleroy alleges that Burnett and Hepp knew he was illiterate because he once asked Burnett to read a deposition to him and Hepp knew that he had only an eighth-grade education. (Doc. 24-1, pp. 66-67).

But Macleroy does not point to a requirement that an employer/supervisor ask other persons whether they know or believe that an employee is disabled. Nor does he cite any authority for the proposition that an employer has the duty to divine an employee's disability based on circumstantial evidence.

This is likely because the Eleventh Circuit has always held to the contrary. For instance, in *Morisky*, the plaintiff did not tell her supervisors about her "specific disability." 80 F.3d at 448. Instead, she tried to rely on how she had told her supervisors she could not read and that she had taken special education courses in the past, arguing that this information gave her employer sufficient notice that she had cerebral palsy. *Id*. The Eleventh Circuit rejected this argument, stating, "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Id*.

*Morisky* clarifies that an employee must provide notice to his employer about his specific disability before the ADA triggers an obligation to accommodate him or refrain from firing him because of the disability. Importantly:

> A contrary rule would require employers to don white coats and diagnose (correctly, no less) employees having any potentially health-related difficulties at work, and then proactively accommodate them on pain of liability under the ADA. Most employers would lack the capacity to make the necessary medical findings even if they could constantly monitor their employees' health. And it would make little sense to put the burden on the party with relatively less knowledge about the possible disability (the employer with some inkling that the employee has a health problem) instead of on the party with relatively more knowledge about it (the employee who is actually experiencing the symptoms, knows his medical history, and has firsthand knowledge about how it affects his job performance).

*Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1292–93 (M.D. Ala. 2012), *aff'd*, 550 F. App'x 748 (11th Cir. 2013). The Court therefore finds that Macleroy cannot impute knowledge of his alleged disability on Childersburg. And if Childersburg did not know about Macleroy's disability, Childersburg could not have fired Macleroy "because of" that disability.

\* \* \*

Macleroy fails to provide sufficient evidence to create a jury question on (a) whether Mcleroy is disabled and, if so, (b) whether Childersburg terminated him because of that disability. As a result, Macleroy cannot make out a prima facie case under the ADA, and Childersburg is entitled to summary judgment on Count III.

## CONCLUSION

For these reasons, the Court hereby **GRANTS** Childersburg's motion for summary judgment on Macleroy's FLSA claim for unpaid overtime (Count I) and his ADA claim for disability discrimination (Count III). The Court will issue a separate order carrying out these findings.

DONE and ORDERED this **9th** day of **April, 2020**.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE